**ANTONIA M. APPS**
**REGIONAL DIRECTOR**
**Thomas P. Smith, Jr.**
**Alison Conn**
**Chevon Walker**
**Ariel Atlas**
**Attorneys for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**100 Pearl Street**
**Suite 20-100**
**New York, NY 10004-2616**
**(212) 336-0090 (Walker)**
**Email: WalkerCh@sec.gov**

### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>                    **Plaintiff,**<br><br>    -against-<br><br>**ANTHONY LOTITO,**<br>**JOSEPH HAGAN,**<br>**REVOLUTION LEASING &**<br>**ADMINISTRATION LLC, and**<br>**SCRYPTMOB II LLC,**<br><br>                    **Defendants.** | **Civil Action No.**<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Securities and Exchange Commission ("Commission"), 100 Pearl

Street, Suite 20-100, New York, New York 10004-2616; for its Complaint against

Defendants Anthony Lotito ("Lotito"), 6 Grant Court, Tinton Falls, NJ, 07724;

Joseph Hagan ("Hagan"), 139 Stone Hill Road, Colts Neck, NJ, 07772; Revolution

Leasing & Administration LLC ("Revolution Leasing"), 6 Grant Court, Tinton Falls,

NJ 07724; and ScryptMob II LLC ("ScryptMob"), 315 Route 34 Ste 115, Colts Neck,

NJ 07722 (collectively, "Defendants"); alleges as follows:

## SUMMARY

1.      Hagan and Lotito, through their respective businesses, ScryptMob and Revolution Leasing, fraudulently offered and sold unregistered securities as distributors for a purported sale leaseback program involving cryptocurrency-related technology ("the Apex Program").

2.      The Apex Program purported to use "Apex Packs," machines that mined bitcoin and performed other technology-related functions such as "high speed data processing, computational power, 3-D rendering and artificial intelligence programming."

3.      To promote investment in the Apex Program, Hagan and Lotito created and distributed offering documents to retail investors, including service agreements that described the Apex Program as an opportunity for investors to generate passive income by purchasing Apex Packs from one subsidiary ("Subsidiary #1") of a public company ("Apex Program Parent Company") and immediately leasing the Apex Packs to a second Apex Program Parent Company subsidiary ("Subsidiary #2") that would pay the investor lease payments ranging between $300 and $500 per month per unit for 36-60 months.

4.      Many who invested in the Apex Program through Hagan and Lotito were elderly, and some invested using funds in their Individual Retirement Accounts ("IRAs").

5.     From approximately November 2019 through July 2021 ("the Relevant Lotito Period"), Lotito, through his company, Revolution Leasing, offered and sold investments in the Apex Program to at least 36 investors who, in exchange, collectively paid Lotito more than $2 million.

6.     From approximately July 2019 through August 2020 ("the Relevant Hagan Period"), Hagan, through his company, ScryptMob, separately offered and sold investments in the Apex Program to at least 27 investors who, in exchange, collectively paid Hagan more than $3.1 million.

7.     In connection with some of these investments, Lotito and Hagan each misappropriated a portion of investors' money and used it to pay for their own personal expenses.

8.     In some instances, during the Relevant Lotito Period, Lotito paid earlier Apex Program investors with the money invested by later Apex Program investors.

9.     The offering documents, including service agreements, that Hagan and Lotito each created and distributed contained material misrepresentations.

10.     Specifically, by approximately April 27, 2020, Hagan and Lotito each knew, or they recklessly disregarded, that there were material differences between the Apex Program as represented in the offering documents and the Apex Program as it was actually operating.

11.     Hagan and Lotito each knew, or they recklessly disregarded, from at least April 27, 2020, that there were problems with the Apex Program, including

that there were significant delivery delays with the Apex Packs, which were necessary to generate this passive income for investors, and that monthly lease payment amounts to investors had been drastically reduced by as much as 80%.

12.     Despite knowledge of problems with the Apex Program, Lotito and Hagan continued to represent to investors through their offering materials that the investors would be purchasing Apex Packs through the Apex Program and promised them the same monthly payments of between $300 and $500 without disclosing the delays in Apex Pack delivery and the significant reduction in lease payments.

13.     Further, on or about June 30, 2020, the Apex Program Parent Company stopped accepting investments into the Apex Program due to what it described as COVID-19-related shipping issues.

14.     Nevertheless, Lotito and Hagan continued to offer and sell investments in the Apex Program, misrepresenting to investors that their investments would be used in the Apex Program even though the Apex Program Parent Company was no longer accepting new investments.

15.     In connection with these post-June 30, 2020 sales, Hagan and Lotito retained all the investors' money and did not transmit investor money to Subsidiary #1.

16.     Also, post-June 30, 2020, Lotito and Hagan continued to promise prospective investors that 100% of their investments were insured by the Apex Program Parent Company's third-party insurer.

17.     In fact, however, as Lotito and Hagan knew, or recklessly disregarded, Lotito and Hagan would not transmit the investors' money to Subsidiary #1 and thus the investors' purchases would not be insured.

18.     The Apex Program ceased to operate completely on or about September 10, 2020.

19.     Lotito continued to offer and sell purported investments in the Apex Program from October 2020 until July 2021, despite his knowledge that the Apex Program had ceased to operate entirely.

20.     Interests in the Apex Program were never registered with the Commission.

21.     Hagan and Lotito marketed the Apex Program to the general public.

22.     At the time they offered and sold investments in the Apex Program, neither Hagan nor Lotito was associated with a Commission-registered broker or dealer.

## VIOLATIONS

23.     By virtue of the foregoing conduct and as alleged further herein, Defendants Hagan, Lotito, Revolution Leasing and ScryptMob have violated Sections 5(a), 5(c) and 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a), 77e(c) and 77q(a)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Hagan and Lotito have also violated Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

24.     Unless Defendants are restrained and enjoined, they will engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

25.     The Commission brings this action pursuant to the authority conferred upon it by Securities Act Sections 20(b) and 20(d) [15 U.S.C. §§ 77t(b) and 77t(d)] and Exchange Act Section 21(d) [15 U.S.C. § 78u(d)].

26.     The Commission seeks a final judgment: (a) permanently enjoining Defendants from violating the federal securities laws and rules this Complaint alleges they have violated; (b) permanently enjoining Defendants from, directly or indirectly, including but not limited to, through any entity owned or controlled by Hagan, Lotito, Revolution Leasing and ScryptMob, participating in the issuance, purchase, offer, or sale of any security; provided, however, that such injunction shall not prevent Hagan and Lotito from purchasing or selling securities for their own personal accounts; (c) ordering Defendants to disgorge all ill-gotten gains they received as a result of the violations alleged here and to pay prejudgment interest thereon, pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)]; (d) ordering Defendants to pay civil money penalties pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)]; (e) permanently prohibiting Lotito and Hagan from serving as an officer or director of any company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that

is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to Securities Act Section 20(e) [15 U.S.C. § 77t(e)] and Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)]; and (f) ordering any other and further relief the Court may deem just and proper.

## JURISDICTION AND VENUE

27.    This Court has jurisdiction over this action pursuant to Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa].

28.    Defendants, directly and indirectly, have made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

29.    Venue lies in this District under Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa], because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district.  In addition, venue is proper in this district because Lotito and Hagan each reside in this judicial district, and Revolution Leasing and ScryptMob each have their principal place of business in this judicial district.

## DEFENDANTS

30.    **Anthony Lotito**, 67 years old, is a resident of Tinton Falls, New Jersey.  Lotito was at all relevant times the CEO and sole owner of Revolution Leasing.

31.    **Joseph Hagan,** age 57, is a resident of Colts Neck, New Jersey.

Hagan was at all relevant times the Managing Director and owner of ScryptMob.

32.     **Revolution Leasing & Administration LLC** is a New Jersey limited liability company formed in 2019 with its principal place of business in Tinton Falls, New Jersey.  Revolution Leasing is wholly owned and operated by Lotito.

33.     **ScryptMob II LLC** is a Delaware limited liability company formed in 2018 with its principal place of business in Colts Neck, New Jersey.  ScryptMob is wholly owned and operated by Hagan.

## OTHER RELEVANT INDIVIDUALS AND ENTITIES

34.     **Apex Program Parent Company** is a Nevada corporation with is principal place of business in Haverford, Pennsylvania.

35.     **Subsidiary #1** is a Utah limited liability company and a wholly owned subsidiary of Apex Program Parent Company.

36.     **Subsidiary #2** is a Utah limited liability company and a wholly owned subsidiary of Apex Program Parent Company.

## FACTS

### I.     The Apex Program

37.     In or around September 2019, Apex Program Parent Company developed and globally launched the Apex Program in which investors provided money for the purchase of Apex Packs from Subsidiary #1 and then immediately leased these Apex Packs to Subsidiary #2.

38.     Subsidiary #2 would operate such Apex Packs and make monthly lease

payments ranging between $300 and $500 per month per Apex Pack to the investor for up to 60 months, generating passive income for the investor.

39.    The Apex Program Parent Company created an Apex Product Information Packet, which described the Apex Program and contained a sample lease agreement.

40.    The sample lease agreement made clear that delivery of the Apex Packs was to be made to "[Subsidiary #2's] hosting partner."

41.    The Apex Product Information Packet did not detail an option for investors to take possession of the Apex Packs.

42.    Also, the Apex Product Information Packet contained details concerning the Apex Program as follows in paragraphs 43 through 45:

43.    Subsidiary #2 would be "fully responsible for operating the Apex technology in a profitable way."

44.    The Apex Program would generate passive income for investors through use of the Apex Packs to process and mine data.

45.    Investor's monthly lease payment was a fixed amount.  Therefore, payment to the investor was not dependent upon the performance of an individual Apex Pack.

46.    According to the Apex Product Information Packet and service agreements, investments in the Apex Program included an insurance plan to guarantee 100% of investors' original investment.

47.    ScryptMob and Revolution Leasing received commissions from

Subsidiary #1 for their sales of investments in the Apex Program.

48.  Lotito, Hagan, Revolution Leasing, and ScryptMob promoted the Apex Program on the internet, available throughout the United States, and secured investments from investors in multiple states through the instrumentalities of interstate commerce.

49.  During the Relevant Lotito Period (approximately November 2019 through July 2021), Lotito created and distributed offering materials to prospective investors, including documents describing the Apex Program and Revolution Leasing service agreements.

50.  Lotito marketed the Apex Program in part through Revolution Leasing's website, https://www.revoleaseadm.com/about.html, publicly accessible from at least September 2020 through the filing of this Complaint, which describes the Apex Program, including a slideshow about the program which represented that investors would make a 21% return per year, and invited investors to: "Discover the Possibilities! Act Now! Enjoy Passive Income!"

51.  The Revolution Leasing website also encouraged prospective investors to "schedule a more in-depth" conversation to get more information.

52.  During the Relevant Hagan Period (approximately July 2019 through August 2020), Hagan created and distributed Apex Program offering materials to prospective investors, including documents describing the Apex Program and ScryptMob service agreements.

53.  As early as September 2019, ScryptMob advertised the Apex Program

in a video on YouTube.com.

54.    In June 2020, Hagan promoted the Apex Program on a financial podcast called "MoneyTV with Donald Baillargeon," publicly available on YouTube.

55.    Also, during the Relevant Hagan Period, Hagan promoted the Apex Program on the television news channel NewsMax through its YouTube channel, "Liquid Lunch."

56.    In addition to Hagan's promotion of the program, these videos described the Apex Program and encouraged investors to "take action today."

57.    Also, during the Relevant Hagan Period, ScryptMob maintained an Instagram account and internet website, www.scryptmobii.com, where it advertised the Apex Program, including by providing webinars.

58.    The offering materials, including service agreements, that Lotito and Hagan gave to prospective investors during the Lotito Relevant Period and the Hagan Relevant Period, respectively, described the Apex Program, in part, as follows in paragraphs 59 through 62:

59.    An investor would purchase an Apex Pack from Subsidiary #1, through ScryptMob or Revolution Leasing, generally at a cost of approximately $15,000 per unit.

60.    The investor would then lease the Apex Pack to Subsidiary #2 for up to 60 months, in exchange for monthly lease payments ranging between $300 and $500.

61.    Investors would receive passive income with annual returns of over

20%.

62.    Investors' Apex Program investments included insurance guaranteeing protection of 100% of their initial investment.

63.    Those who invested in the Apex Program through Hagan were required to execute service agreements with ScryptMob and those who invested through Lotito were required to execute service agreements with Revolution Leasing to allow the distributor to complete the Apex Program purchases on behalf of the investors and to subsequently distribute lease payments to them.

64.    Based upon the foregoing, investments in the Apex Program were offered and sold as "investment contracts," and thus securities within the meaning of Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b(a)(1)] and Section 3(a)(10) of the Exchange Act [15 U.S.C. 78c(a)(10)].

## II.    Lotito and Hagan Knew, Or Recklessly Disregarded, that the Apex Program Was Experiencing Difficulties and Had Reduced Lease Payments to Existing Investors

65.    Shortly after its launch on September 1, 2019, the Apex Program began to have difficulty acquiring Apex Packs.

66.    As early as April 2020, the Apex Program Parent Company alerted its distributors, including Lotito and Hagan, respectively, by email, that the Apex Packs were delayed due to what the company described as COVID-19-related shipping issues.

67.    As a result, by at least April 27, 2020, Hagan and Lotito each knew, or recklessly disregarded, that Subsidiary #2 had reduced lease payments to all

existing Apex Program investors by up to 80%.

68.    On or about April 27, 2020, Hagan forwarded existing Apex Program investors an email, which he described as a communication from Subsidiary #2, describing "significant manufacturing delays due to the shutdown of all business in Asia which has pushed our processing equipment shipment dates back several months," and indicated that at least one of its operational facilities was closed, reducing the operational capacity of Subsidiary #2 to only 20%.

69.    The statement Hagan forwarded to existing Apex Program investors also announced that Subsidiary #2 would reduce lease payments to $100 for the next 30 to 60 days but would make up any shortfall through additional lease payments at the end of the lease term.

70.    Around the same time, Lotito contacted Apex Program Parent Company's Director of Finance ("Director of Finance") about the reduction in lease payments in an April 25, 2020 email, with the subject line, "IMPORTANT I urge you to read."

71.    Lotito's April 25, 2020, email to the Director of Finance contained an attached letter, which Lotito described in his email as "my opinion why I believw [sic] modifying [Subsidiary #2] payments to existing participants is a potential disaster."

72.    In the letter attached to his April 25, 2020, email, Lotito stated the following:

> I have been made aware of your potential decision to stop or modify payments to Lessees during the Covid 19 period. I urge you to

reconsider this decision. The result of such a move will destroy the [Subsidiary #2] program completely . . .

I urge you to reconsider this decision. The investors involved in this transaction are led to believe that the [Subsidiary #1] [Subsidiary #2] Sales Leaseback Program is a safe investment based on the fact that the lease payments and the units that are leased are immune from day to day business issues regardless of what occurs-they are entitled to their payment. This is a lease program not a participation program (which would make it a security by the definition of a security). . . . . . .
An investor especially an institutional investor will see a modification or forbearance of any type as a fatal flaw and will not invest in this program going forward. This is a disaster.

(Highlighting in original.)

73.     In the same letter, Lotito suggested alternatives to halting or modifying payments to investors in the Apex Program.

74.     The next day, in an emailed response to Lotito, the Director of Finance confirmed that the Apex Program was experiencing temporary "issues outside of [its] control," including "market collapse," higher costs and shipping delays.

75.     In the same email, the Director of Finance stressed that they have "no option but to temporarily reduce the payments and are committed to compensating for the reduced payment amounts in the future."

76.     The Director of Finance continued that "[w]e are doing all we can to cure this situation as quickly as possible, and are confident that over the next 60 to 90 days, we will be back on track."

77.     Ultimately, on June 30, 2020, Apex Program Parent Company halted Apex Program sales.

78.     By July 1, 2020, any attempt to purchase Apex Packs by the electronic

system used by Subsidiary #1 would result in an error message that stated, in part, "we are not allowing new purchases of APEX units . . .."

79.     Additionally, in its August 14, 2020, Form 10-Q filing with the Commission, Apex Program Parent Company stated that it had ceased selling the APEX Program, referencing supply chain issues regarding the sourcing of cryptocurrency miners due to COVID-19.

80.     Between September 10 and September 15, 2020, Apex Program Parent Company delivered a notice to Apex Program distributors, including Lotito and Hagan, informing them that Apex Program Parent Company was "unable to secure the necessary output to support the Apex model" and that the company was "working on a variety of solutions with partners and potential investors" to create a "buy back/purchase refund scenario."

81.     Apex Program Parent Company subsequently implemented a "buy-back" program to replace the defunct Apex Program.

82.     Both Lotito and Hagan participated in the buy-back program on behalf of their investors.

83.     To date, Lotito, through Revolution Leasing, and Hagan, through ScryptMob, have made periodic payments to Apex Program investors.

## III.   Lotito and Revolution Leasing Made Misrepresentations and Omissions to Apex Program Investors

84.     Lotito, through Revolution Leasing, enrolled at least 36 investors, in at least four states, into the Apex Program, raising a total of over $2 million during the Relevant Lotito Period.

85.     Many of those who invested through Lotito were elderly.

86.     From November 2019 to late 2020, to participate in the Apex Program, each of Lotito's investors executed an administrative services agreement ("the Revolution Leasing Agreement"), which authorized Revolution Leasing to act as the investor's "purchasing representative" in the acquisition of "APEX Technology Pack Units" and "do all tasks necessary to secure the APEX Technology Pack Units" on behalf of the investor.

87.     The Revolution Leasing Agreement also authorized Revolution Leasing to enter into a "Sale/Leaseback agreement" with Subsidiary #2 on the investor's behalf.

88.     The Revolution Leasing Agreement stated that "Lessee agrees to pay to Lessor" a monthly amount, typically $450, to rent the Apex Pack.

89.     Revolution Leasing committed to provide a variety of services "related to and necessary of [sic] procuring ownership of APEX Technology Pack."

90.     Services included the "collection and distribution of funds and administration of matters related to APEX units."

**A. Lotito and Revolution Leasing Continued to Offer and Sell Investments in the Apex Program after Lotito Knew, or Recklessly Disregarded, that the Apex Program was Experiencing Significant Operational Difficulties and that Lease Payments Had Been Substantially Reduced**

91.     On April 23, 2020, Lotito received an email from Subsidiary #2 alerting him that due to government shutdowns, Subsidiary #2 closed one of its operational facilities, "reducing our operational capacity to only 20%."

92.     In the April 23, 2020 email, a representative of Subsidiary #2 noted that the company was planning to (and shortly thereafter did) reduce monthly lease payments to existing investors to $100 a month, up to an 80% reduction.

93.     Despite knowing from these emails that the Apex Program was experiencing significant operational difficulties and that the Apex Program Parent Company had substantially reduced lease payments to existing investors, Lotito continued to offer and sell investments in the Apex Program to potential investors, promising up to $500 a month in lease payments.

94.     Even after he knew, and expressed concern about, the reduction in the lease payments, Lotito represented to prospective investors through the Revolution Leasing Agreements and offering materials that the Apex Packs would generate passive income in the amount of $450 to $500 monthly to the investor.

95.     For example, on May 6, 2020, Lotito distributed a fact sheet concerning the Apex Program, which touted monthly payments of $450 to $500.

96.     The representations concerning the amount of the lease payment were material.

97.     That fact sheet contained a Revolution Leasing logo at the bottom and listed Lotito as contact.

98.     However, these post-April 2020, offering documents did not disclose that Subsidiary #2 was having difficulty procuring Apex Packs.

99.     Further, the post-April 2020, offering documents that Lotito provided to investors did not disclose that Subsidiary #2 had reduced lease payments to

existing Apex Program investors by 80%, a fact which Lotito had referred to as a "disaster."

100.    Also, Lotito continued to represent that investors would receive monthly payments of between $450 and $500 from Subsidiary #2 in connection with the Apex Program in the Revolution Leasing Agreements he created and which he had investors sign to invest in the Apex Program.

101.    Between the time that Lotito knew about the significant operational difficulties and the anticipated resulting reduction of lease payments in late April 2020, and the Apex Program Parent Company's decision in June 2020 to cease accepting new investments into the Apex Program, Lotito raised approximately $499,000 from several investors.

**B. Lotito and Revolution Leasing Continued to Offer and Sell Investments in the Apex Program After It Was Discontinued**

102.    By June 30, 2020, the Apex Program Parent Company was not accepting new investments into the Program.

103.    Nevertheless, even after that date, Lotito continued to offer the same Apex Program terms to investors with similar promised monthly payments.

104.    Lotito continued to represent to prospective investors that their money would be used to invest in the Apex Program through the purchase of Apex Packs and that their return would derive from Subsidiary #2's operation of those Packs.

105.    These representations were material.

106.    Lotito did not transmit the money that he raised from investors after June 30, 2020, to Subsidiary #1 for investment.

107.    The offering materials that Lotito provided to prospective investors continued to represent that their investment included third party insurance protection, which protected 100% of the investor's investment.

108.    The insurance, however, was purportedly purchased by the Apex Program Parent Company.

109.    In reality, Lotito was not transmitting investor money to Subsidiary #1 in connection with their investments, thus, as Lotito knew, or recklessly disregarded, no insurance was being purchased in connection with these investments.

110.    Lotito enrolled approximately 18 investors and raised approximately $900,000 between July 3, 2020, and July 27, 2021, all after the Apex Program had closed to new investments (as of June 30, 2020) and subsequently ceased to operate entirely (as of September 2020).

111.    After the Apex Program ended in September 2020, Lotito negotiated with the Apex Program Parent Company to receive 30 million shares of Apex Program Parent Company stock.

112.    Some of the proceeds from the sale of this stock have been used to pay back to investors the principal they invested through monthly payments.

113.    In October 2020, Lotito revised the Revolution Leasing Agreement to represent that the investor would purchase "Reserved Collateral Funding Units" to "purchase and manage APEX Technology Pack Units and to do all tasks necessary to secure the business opportunity known as sale leaseback of APEX Technology

Pack Units on behalf of the [investor]."

114.    Lotito and Revolution Leasing continued to promote the Apex Program on the internet, in part through Revolution Leasing's website, https://www.revoleaseadm.com/about.html, available throughout the United States, and secured additional investments from investors in multiple states through the instrumentalities of interstate commerce.

115.    In the revised Leasing Agreement, Revolution Leasing promised to provide services, including the collection and distribution of revenue and the administration of matters related to Apex Packs.

116.    Revolution Leasing also promised to make the monthly payments to the investor "in cash via the liquidation of financial instruments converted to cash and or cash distributed by APEX."

117.    Using this revised Revolution Leasing Agreement, Lotito continued to offer and sell investments in the Apex Program, which were "investment contracts," and thus securities within the meaning of Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b(a)(1)] and Section 3(a)(10) of the Exchange Act [15 U.S.C. 78c(a)(10)].

118.    In the revised Leasing Agreement, Lotito continued to falsely represent that the investor's money would be used to purchase Apex Packs, which would be immediately leased to Subsidiary #2, in exchange for regular payments to investors.

119.    For example, a Revolution Leasing Agreement, executed by an investor in March 2021, was for the purported purchase of 12 "RESERVED COLLATERAL

FUNDING UNITS . . . to purchase and manage APEX Technology Pack Units and to do all tasks necessary to secure the business opportunity known as sale leaseback of APEX Technology Pack Units on behalf of the Client."

120.    The Leasing Agreement also falsely claimed that the APEX Technology Pack Unit would be simultaneously leased to Subsidiary #2, resulting in a $383 per unit monthly payment to the investor.

121.    This was all false.  As Lotito knew, or recklessly disregarded, there was no longer an Apex Program in which to invest.

## IV.    Lotito Misappropriated Investor Money

122.    From November 2019 through June 2020 before the Apex Program closed to new investments, Lotito raised approximately $1 million from investors for the Apex Program.

123.    In connection with these sales, Lotito received approximately $90,000 from Subsidiary #1 in commissions.

124.    Lotito transmitted approximately $928,000 of the approximately $1 million he raised from investors during this period to Subsidiary #1.

125.    Lotito misappropriated a portion of investor money and used it to pay for his own personal expenses.

126.    A number of these transfers occurred immediately (or close in time) after investors deposited the funds into the Revolution Leasing account.

127.    For example, on or about November 6, 2019, an investor ("Investor A") wired $68,500 to a Revolution Leasing bank account controlled by Lotito, for the

purchase of five Apex Units.

128.    Prior to Investor A's deposit, the Revolution Leasing bank account had a negative balance.

129.    The same day of Investor A's deposit, Lotito immediately began using the funds for personal expenses, including, among other things, auto insurance payments, phone payments, a cash withdrawal, a credit card payment, and food.

130.    Eventually, days later, on or about November 12, 2019, Lotito wired $44,000 of Investor A's funds to Subsidiary #1 for investment but left a portion of the investor's funds in the Revolution Leasing account where he continued to spend it on his personal expenses.

131.    Between July 3, 2020 and July 27, 2021, Lotito raised approximately $900,000 from about 18 investors, misrepresenting that they were investing in the Apex Program.  Lotito did not transmit any of this money that he raised to Subsidiary #1.  He misappropriated all of it.

132.    Lotito used a portion of this money he received from these investors to make payments to earlier investors.

133.    For example, on or about October 15, 2020, October 21, 2020, and November 2, 2020, each date after the Apex Program had ceased entirely, three investors seeking to invest in the Apex Program collectively deposited at least $76,000 into a Revolution Leasing bank account, for which Lotito was a signatory.

134.    Prior to these October and November 2020 deposits, the Revolution Leasing bank account had a balance of $5,391.50.

135.    Lotito did not send any of the investors' money to Subsidiary #1, but instead, between October 15, 2020 and November 6, 2020, Lotito used those three investors' money to make payments, totaling at least $5,400 to at least five different, earlier Apex Program investors.

136.    From November 2019 through July 2021, Lotito spent Apex Program investor money held in the Revolution Leasing account on fees for a golf course membership, restaurants, at food stores and liquor stores, and on lease payments on a Nissan automobile, among other personal expenses.

## V.    Hagan and ScryptMob Made Material Misrepresentations and Omissions to Apex Program Investors

137.    During the Relevant Hagan Period, Hagan, through ScryptMob, offered and sold investments in the Apex Program to approximately 27 investors in at least five states, raising a total of over $3.1 million.

138.    Many investors used money from their IRA accounts at Hagan's direction to invest in the Apex Program.

139.    Those who invested through Hagan entered into a "Full-Service Agreement" ("the ScryptMob Agreement") with ScryptMob whereby ScryptMob represented that it would purchase "Data Technology Units (i.e. Samsung Processing Cards, firmware, software, upgrades and maintenance) from [Subsidiary #1]."

140.    The ScryptMob Agreement explained that the units would be "utilized in diverse applications such as data processing, data mining, and cryptocurrency mining."

141.    According to the ScryptMob Agreement, investors generally paid $15,000 for each "unit" and were promised $500 per unit in cash each month for 60 months.

142.    According to the offering materials that Hagan provided to investors during the Relevant Hagan Period and the ScryptMob agreement, the monthly payments to investors would be generated by the Apex Packs.

A. **Hagan and ScryptMob Continued to Offer and Sell Investments in the Apex Program after Hagan Knew, or Recklessly Disregarded, that the Apex Program was Experiencing Significant Operational Difficulties and that Lease Payments Had Been Substantially Reduced**

143.    As indicated by his April 27, 2020, email to existing investors, Hagan knew by then that the Apex Program was experiencing significant operational difficulties and had immediately substantially reduced lease payments to existing investors, Hagan continued to solicit investments in the Apex Program and provide offering materials, including service agreements, that promised a $500 monthly lease payment to investors.

144.    The representations concerning the amount of the lease payment were material.

145.    Hagan's post-April 2020, offering materials, which he provided to prospective investors, failed to disclose that the Apex Program was having difficulty acquiring the Apex Packs.

146.    Additionally, Hagan's post-April 2020, offering materials to prospective investors failed to disclose Subsidiary #2's significant immediate reduction in lease

payments to existing investors to just $100.

147.    For example, a service agreement dated June 30, 2020 promised that ScryptMob would purchase Apex Packs from Subsidiary #1 and continued to promise monthly payments of $500 for 60 months.

148.    Between April 27, 2020 and June 30, 2020, approximately eight investors collectively invested approximately $555,000 in the Apex Program through Hagan and ScryptMob.

**B. Hagan and ScryptMob Continued to Offer and Sell Investments in the Apex Program after It Was Discontinued**

149.    By June 30, 2020, the Apex Program Parent Company was not accepting new investments into the Program.

150.    Nevertheless, Hagan, through ScryptMob, continued to offer and sell investments in the Apex Program, as if the program were still active.

151.    Hagan continued to represent to prospective investors that their money would be used to invest in the Apex Program through the purchase of Apex Packs and that their return would derive from Subsidiary #2's operation of those Packs.

152.    These representations were material.

153.    After June 30, 2020, Hagan sold investments in the Apex Program to two additional investors who collectively gave Hagan approximately $40,000 to invest.

154.    Hagan did not transmit the $40,000 of investors' money to Subsidiary #1.  Instead, he kept it.

155.    ScryptMob agreements for these post-June 2020 investors continued to represent, as before, that the investments were protected by an insurance program.

156.    Because Hagan was not, in fact, transmitting investor money to Subsidiary #1 in connection with their investments, he knew, or recklessly disregarded, that no insurance was being purchased in connection with these investments.

157.    When the Apex Program ended, Hagan received a promissory note from Apex Program Parent Company, some of the proceeds of which have been used to pay back to investors the principal they invested in the Apex Program through monthly payments.

## VI.    Hagan and ScryptMob Misappropriated Investor Money

158.    In connection with raising approximately $3.1 million from approximately 27 investors in the Apex Program during the Relevant Hagan Period, Hagan received approximately $270,000 in commissions from Subsidiary #1.

159.    During the Relevant Hagan Period, Hagan used a portion of Apex Program investor funds for his own personal use, often transferring investor money to his personal accounts.

160.    A number of these transfers occurred immediately (or close in time) after investors deposited the funds into a ScryptMob account.

161.    On several occasions in 2019 and 2020, Hagan obtained money from investors in connection with the Apex Program but then did not transmit the money to Subsidiary #1 at all.

162.    For example, on or about December 10, 2019, Investor B transmitted

$132,000 into a ScryptMob account controlled by Hagan.

163.    Prior to the investment, this account had a balance of approximately $58.00.

164.    Hagan did not send any of this money to Subsidiary #1.

165.    Instead, he used the money for his personal benefit, including to make an approximately $90,000 tax payment to the IRS and for personal retail expenses.

166.    Another example of Hagan's misuse of investor funds occurred after the Apex Program was closed to new investments, when Hagan misappropriated all investor funds.

167.    On or about August 11, 2020, an investor wired $25,000 into a ScryptMob account, for the purchase of two Apex Packs in connection with an investment in the Apex Program.

168.    Prior to the August 11, 2020, deposit, the ScryptMob account had a balance of $46.52.

169.    That same day, Hagan transferred $15,000 from the ScryptMob account to his personal checking account.

170.    Also, that day, Hagan transferred the investor's remaining $10,000 from the ScryptMob account to the bank account of another business for which Hagan was a signatory.

171.    Hagan did not send any of the investor's $25,000 to Subsidiary #1.

172.    Over the two days that followed, Hagan spent a portion of these funds at a supermarket, phone provider, and on gas and electric bills, among other

expenses.

173.    Hagan also used other investor funds for a variety of personal expenses, including a $13,000 payment on or about February 11, 2020, for college tuition, and numerous clothing and food purchases.

## VII.    TOLLING AGREEMENTS

174.    Defendants have entered into tolling agreements with the Commission, tolling the statute of limitations to this action for the period of May 10, 2024 through August 8, 2024.

### FIRST CLAIM FOR RELIEF
### Violations of Securities Act Section 17(a)
### (All Defendants)

175.    As to defendants Lotito and Revolution Leasing, the Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 5, 7 through 51, 58 through 67, 70 through 136, and 174.

176.    As to defendants Hagan and ScryptMob, the Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 4, 6 through 7, 9 through 18, 20 through 48, 52 through 69, 77 through 83, and 137 through 174.

177.    Defendants, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or the mails, (1) knowingly or recklessly have employed one or more devices, schemes or artifices to defraud, (2) knowingly, recklessly, or negligently have obtained money or property by means of one or more untrue statements of a material fact or omissions of a material fact necessary in

order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (3) knowingly, recklessly, or negligently have engaged in one or more transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

178.    By reason of the foregoing, Defendants, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

**SECOND CLAIM FOR RELIEF**
**Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder**
**(All Defendants)**

179.    As to defendants Lotito and Revolution Leasing, the Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 5, 7 through 51, 58 through 67, 70 through 136, and 174.

180.    As to defendants Hagan and ScryptMob, the Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 4, 6 through 7, 9 through 18, 20 through 48, 52 through 69, 77 through 83, and 137 through 174.

181.    Defendants, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly have (i) employed one or more devices, schemes, or artifices to defraud, (ii) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the

statements made, in light of the circumstances under which they were made, not misleading, and/or (iii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

182.    By reason of the foregoing, Defendants, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### THIRD CLAIM FOR RELIEF
### Violations of Exchange Act Section 15(a)
### (Defendants Lotito and Hagan)

183.    As to defendant Lotito, the Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 5, 7 through 51, 58 through 67, 70 through 136, and 174.

184.    As to defendant Hagan, the Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 4, 6 through 7, 9 through 18, 20 through 48, 52 through 69, 77 through 83, and 137 through 174.

185.    Lotito and Hagan, as a natural person not associated with a broker or dealer which is a person other than a natural person, made use of the mails or any means or instrumentality of interstate commerce to effect transactions in, or to induce or attempt to induce the purchase or sale of, any security without being registered with the Commission as a broker-dealer.

186.    By reason of the foregoing, Lotito and Hagan violated, and, unless enjoined, will again violate Exchange Act Section 15(a) [15 U.S.C. § 78o(a)].

**FOURTH CLAIM FOR RELIEF**
**Violations of Securities Act Sections 5(a) and (c)**
**(All Defendants)**

187.    As to defendants Lotito and Revolution Leasing, the Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 5, 7 through 51, 58 through 67, 70 through 136, and 174.

188.    As to defendants Hagan and ScryptMob, the Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 4, 6 through 7, 9 through 18, 20 through 48, 52 through 69, 77 through 83, and 137 through 174.

189.    Defendants, directly or indirectly, singly or in concert, (i) made use of means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement was in effect; (ii) for the purpose of sale or for delivery after sale, carried or caused to be carried through the mails or in interstate commerce, by any means or instruments of transportation, securities as to which no registration statement was in effect; or (iii) made use of means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy, through the use or medium of a prospectus or otherwise, securities as to which no registration statement had been filed.

190.    By reason of the foregoing, Defendants violated and, unless enjoined, will again violate, Securities Act Sections 5(a) and 5(c) [15 U.S.C. §§ 77e(a) and 77e(c)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

### I.

Permanently enjoining each of the Defendants and their agents, servants, employees and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Securities Act Sections 5(a) and (c) and 17(a) [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)], Exchange Act Section 10(b) [15 U.S.C. § 78j(b)], and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)];

### II.

Permanently enjoining Lotito, Hagan and their agents, servants, employees and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Exchange Act Section 15(a) [15 U.S.C. § 78o(a)];

### III.

Permanently enjoining Defendants from, directly or indirectly, including but not limited to, through any entity owned or controlled by Hagan, Lotito, Revolution Leasing and ScryptMob, participating in the issuance, purchase, offer, or sale of any security; provided, however, that such injunction shall not prevent Hagan and Lotito from purchasing or selling securities for their own personal accounts.

### IV.

Ordering Defendants to disgorge all ill-gotten gains they received directly or indirectly, with pre-judgment interest thereon, as a result of the alleged violations,

pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)];

## V.

Ordering Defendants to pay civil monetary penalties under Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)];

## VI.

Permanently prohibiting Lotito and Hagan from serving as an officer or director of any company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to Securities Act Section 20(e) [15 U.S.C. § 77t(e)] and Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)]; and

## VII.

Granting any other and further relief this Court may deem just and proper.

**JURY DEMAND**

The Commission demands a trial by jury.


Dated:  New York, New York
        September 20, 2024

                        __s/ Antonia M. Apps_____

                        ANTONIA M. APPS
                        REGIONAL DIRECTOR
                        Thomas P. Smith, Jr.*
                        Alison Conn*
                        Chevon Walker
                        Ariel Atlas*
                        Attorneys for Plaintiff
                        SECURITIES AND EXCHANGE COMMISSION
                        New York Regional Office
                        100 Pearl Street
                        Suite 20-100
                        New York, NY 10004-2616
                        (212) 336-0090 (Walker)
                        Email: walkerch@sec.gov

                        *Not admitted in the District of New Jersey

## LOCAL RULE 11.2 CERTIFICATION

Pursuant to Local rule 11.2, I certify that the matter in controversy alleged in

the foregoing Complaint is not the subject of any other action pending in any court,

or of any pending arbitration or administrative proceeding.

Dated:  New York, New York
         September 20, 2024

                        s/ Antonia M. Apps

                    ANTONIA M. APPS
                    REGIONAL DIRECTOR
                    Thomas P. Smith, Jr.
                    Alison Conn
                    Chevon Walker
                    Ariel Atlas
                    Attorneys for Plaintiff
                    SECURITIES AND EXCHANGE COMMISSION
                    New York Regional Office
                    100 Pearl Street
                    Suite 20-100
                    New York, NY 10004-2616
                    (212) 336-0090 (Walker)
                    Email: walkerch@sec.gov

## DESIGNATION OF AGENT FOR SERVICE

Pursuant to Local Rule 101.1(f), because the Securities and Exchange Commission (the "Commission") does not have an office in this district, the United States Attorney for the District of New Jersey is hereby designated as eligible as an alternative to the Commission to receive service of all notices or papers in the captioned action. Therefore, service upon the United States or its authorized designee, Matthew J. Mailloux, Assistant United States Attorney, Civil Division, United States Attorney's Office for the District of New Jersey, 970 Broad Street, 7th Floor, Newark, NJ 07102, shall constitute Service upon the Commission for purposes of this action.

Dated:  New York, New York
      September 20, 2024

                                    _s/ Antonia M. Apps_____
                                    ANTONIA M. APPS
                                    REGIONAL DIRECTOR
                                    Thomas P. Smith, Jr.
                                    Alison Conn
                                    Chevon Walker
                                    Ariel Atlas
                                    Attorneys for Plaintiff
                                    SECURITIES AND EXCHANGE COMMISSION
                                    New York Regional Office
                                    100 Pearl Street
                                    Suite 20-100
                                    New York, NY 10004-2616
                                    (212) 336-0090 (Walker)
                                    Email: walkerch@sec.gov