**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION**, | |
| Plaintiff, | Civil Action No. 24-9348 (ZNQ) (TJB) |
| v. | **OPINION** |
| **ANTHONY LOTITO,** *et al.*, | |
| Defendants. | |

**QURAISHI, District Judge**

  **THIS MATTER** comes before the Court upon two separate motions to dismiss filed by Defendants Anthony Lotito ("Lotito") and Revolution Leasing & Administration LLC ("RLA") (ECF No. 40), and Defendants Joseph Hagan ("Hagan") and ScryptMob II LLC ("ScyptMob") (ECF No. 41).  Lotito and RLA (collectively, "Lotito Defendants") filed a brief in support of their motion ("Lotito Br.," ECF No. 40-8), as did Hagan and ScyptMob (collectively, "Hagan Defendants") ("Hagan Br.," ECF No. 41-1).  Plaintiff Securities and Exchange Commission ("SEC") filed a consolidated opposition.  ("Opp.," ECF No. 47.)  Both Hagan Defendants and Lotito Defendants filed individual replies.  (ECF Nos. 48, 49.)

  The Court has carefully considered the parties' submissions and decides the Motions without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1.  For the reasons set forth below, the Court will **DENY** Defendants' motions.

1

I.  **BACKGROUND AND PROCEDURAL HISTORY**

Defendant Hagan is the Managing Director and owner of ScryptMob. ("SAC", ECF No. 35 ¶¶ 32, 34.) Defendant Lotito is the sole owner and Chief Executive Officer of RLA. (*Id.* ¶¶ 31, 33.) As alleged by the SEC, Lotito and Hagan, through their respective companies, "fraudulently offered and sold unregistered securities as distributors for a purported sale leaseback program involving cryptocurrency related technology." (*Id.* ¶ 1.) At the heart of this program were "Apex Packs," machines that mined bitcoin and performed other technology-related functions. (*Id.* ¶ 2.)

In September 2019, Investview, Inc. ("Investview") launched the Apex Program whereby investors would purchase Apex Packs from ApexTech, LLC ("ApexTech") and immediately lease these Apex Packs to SAFETek, LLC ("SafeTek").[1] (*Id.* ¶ 38.) SafeTek would then operate the Apex Packs and make monthly lease payments ranging between $300 and $500 per month per Apex Pack to the investor for up to 60 months. (*Id.* ¶ 39.) Informational materials about the Apex Program stated that SafeTek would be "fully responsible for operating the Apex technology in a profitable way", that it would put "the APEX technology to use in their data facilities," and that it "will leverage this new APEX Technology to partner with companies that require mining and use of big data." (*Id.* ¶¶ 45–47.) Each investor's monthly lease payment was a fixed amount and therefore not dependent on the performance of an individual Apex Pack. (*Id.* ¶ 49.) The Apex Program also included an insurance plan that guaranteed 100% of the investors' original investment. (*Id.* ¶ 50.) Defendants offered and sold investments in the Apex Program, whereby they would receive a commission for each unit sold. (*Id.* ¶¶ 5–6, 51.)

---

[1] The SAC refers to Investview as "Apex Program Parent Company," refers to ApexTech as "Subsidiary #1", and refers to SafeTek as "Subsidiary #2." (Hagan Br. at 2 n.3.)

2

Shortly after the Apex Program launched, Investview began to have difficulty acquiring Apex Packs. (*Id.* ¶ 72.) In April 2020, Investview emailed its distributors, including Lotito and Hagan, to inform them that Apex Packs were going to be delayed due to COVID-19 shipping issues. (*Id.* ¶ 73.) Moreover, the operational capacity of SafeTek was going to be reduced to 20% and the lease payments to investors would be dropped to $100 for at least 30 to 60 days. (*Id.* ¶ 76.) Based upon this information, Lotito emailed Investview's Director of Finance and urged him to reconsider the decision to reduce lease payments, calling it a "fatal flaw" and warning that investors would stop investing in the program. (*Id.* ¶ 80.) Ultimately, on June 30, 2020, Investview halted new Apex Program sales. (*Id.* ¶ 85.)

Even after Lotito learned of SafeTek's reduction in operational capacity, he nonetheless continued to inform investors that the Apex Packs would generate monthly payments of $450 to $500. (*Id.* ¶ 101.) Moreover, after Investview halted Apex Pack sales, Lotito continued to represent to prospective investors that their money would be used to invest in the Apex Program. (*Id.* ¶ 112.) Rather than investing in the Apex Program, Lotito misappropriated these funds to pay for various personal expenses. (*Id.* ¶ 139.)

Similarly, Hagan continued to solicit investment in the Apex Program, promising a $500 monthly lease payment to investors. (*Id.* ¶ 157.) These solicitations were made by Hagan even after learning of the reduced operational capacity of SafeTek. (*Id.*) Moreover, none of the offering materials Hagan provided to investors disclosed the reduction in lease payments to existing investors to $100. (*Id.* ¶ 160.) And like Lotito, Hagan also continued to sell investments in the Apex Program after it was discontinued by Investview, keeping the money for himself and spending it on personal expenses. (*Id.* ¶¶ 170, 174–89.)

The SEC now brings multiple claims against Defendants for violations of the Securities Act: (a) violations of Section 17(a) (Count I); (b) violations of Exchange Act Section 10(b) and Rule 10b-5 (Count II); (c) violations of Exchange Act Section 15(a) (Count III); and (d) violations of Securities Act Sections 5(a) and (c) (Count IV). Although Defendants filed separate motions to dismiss, they each argue that the SAC should be dismissed because: (1) the transactions do not involve "securities" under applicable federal securities laws; (2) the fraud claims have not been pled with particularity; (3) the SAC does adequately plead scienter; and (4) the SAC does not plausibly allege any deceptive or manipulative act under Section 17(a).

## II. SUBJECT MATTER JURISDICTION

The Court has jurisdiction pursuant to 15 U.S.C. § 77v(a) and § 78aa.

## III. LEGAL STANDARD

A district court conducts a three-part analysis when considering a motion to dismiss pursuant to Rule 12(b)(6). *See Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011). "First, the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.'" *Id.* (alteration in original) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)). Second, the court must accept as true all of the plaintiff's well-pled factual allegations and "construe the complaint in the light most favorable to the plaintiff." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (citation omitted). The court, however, may ignore legal conclusions or factually unsupported accusations that merely state the defendant unlawfully harmed the plaintiff. *See Iqbal*, 556 U.S. at 678 (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Finally, the court must determine whether "the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Fowler*, 578 F.3d at 211 (quoting *Iqbal*, 556 U.S. at 679). A facially plausible claim "allows the court to draw the reasonable inference that the defendant is liable for the

4

misconduct alleged." *Id.* at 210 (*quoting Iqbal*, 556 U.S. at 663). On a Rule 12(b)(6) motion, the "defendant bears the burden of showing that no claim has been presented." *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) (*citing Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991)).

IV.     **DISCUSSION**

   A.    **Extrinsic Documents**

Defendants' motions to dismiss relies on numerous documents outside of the SAC.[2] The SEC argues that none of these documents, except for one, should be considered on the instant motions to dismiss.[3] (Opp. at 27–28.) These exhibits consist of three categories of documents: (1) Investview filings with the SEC and a public announcement; (2) Investview's Apex Product Information Packet; and (3) service agreements between RLA/ScryptMob and their customers. On a motion to dismiss pursuant to Rule 12(b)(6), a court may consider evidence outside of the complaint if: (1) "the document is incorporated by reference, or (2) the adjudicative fact at issue is subject to judicial notice." *Spar v. Celsion Corp.*, Civ. No. 20-15228, 2023 WL 2069725, at *4 (D.N.J. Feb. 6, 2023) (citation modified). As to the latter category, the Court "may rely on documents that are 'integral to or explicitly relied upon in the complaint.'" *Dang v. Amarin Corp. plc*, 750 F. Supp. 3d 431, 454 (D.N.J. 2024). The extrinsic document cannot simply be cited in the complaint, rather the claims must be based on it. *See id.* "The exception's purpose is to prevent a plaintiff from maintaining a claim of fraud by extracting an isolated statement from a document

---

[2] References to "Lotito Ex." refer to the exhibits attached to the Certification of Counsel filed by Lotito Defendants at ECF No. 40-1. References to "Hagan Ex." refer to the exhibits attached to the Certification of Counsel filed by Hagan Defendants at ECF No. 41-2.
[3] The SEC appears to concede that Lotito Ex. E and Hagan Ex. F, Investview's August 14, 2020 Form 10-Q, can be considered by the Court.

5

and placing it in the complaint, even though if the statement were examined in the full context of the document, it would be clear that the statement was not fraudulent." *Id.*

First, the SEC argues that Investview's filing with the SEC should not be considered because they are "not directly referenced in the SAC." (Opp. at 27.) At issue are Investview's Form 10-K dated June 29, 2020 (Lotito Ex. B; Hagan Ex. A) and Form 10-K dated June 29, 2021 (Lotito Ex. F; Hagan Ex. G). Here, the SAC describes Defendants' conduct from 2019 to 2021 in support of its allegations that Defendants violated the federal securities laws. (SAC ¶ 5.) These Form 10-K disclosures therefore are relevant to Investview's conduct during the alleged time period, and the Court may take judicial notice of them. *See Dang*, 750 F. Supp. at 455. However, the press release (Hagan Ex. E) discussing the removal of employees at ApexTech will not be considered by the Court because it is neither "integral to" the SAC nor subject to "judicial notice." *Id.* at 456 (declining to consider analyst reports).

Second, Defendants attach copies of an Apex Program Information Packet. (Hagan Ex. B; Lotito Ex. C.) It does not appear that these documents are cited to by Defendants in their motions, but the Court will nevertheless consider them because they are "integral to" the SAC. *See Dang*, 750 F. Supp. 3d at 454. Indeed, the SAC refers to and describes the Apex Program Information Packet in detail. (SAC ¶¶ 40–47.)

Third, Defendants attach various service agreements with ScryptMob and RLA customers. (Hagan Exs. C, D; Lotito Exs. D.) While the SEC concedes that these documents do not contradict the SAC, it appears that the claims in the complaint are also based, in part, on these service agreements. As such, the Court may consider them without converting Defendants' motions to dismiss into a motion for summary judgment. *Dang*, 750 F. Supp. at 455.

### B. Definition Of Securities

Defendants argue that the SAC must be dismissed because the transactions at issue do not involve "securities" under applicable federal securities laws. (Hagan Br. at 9; Lotito Br. at 13.) The term "security" is broadly defined, however, and "encompass[es] virtually any instrument that might be sold as an investment." *SEC v. Edwards*, 540 U.S. 389, 393 (2004). Securities include "any note, stock, treasury stock, security future, bond, debenture, . . . investment contract, . . . [or any] instrument commonly known as a 'security.'" *Id.* (alterations in original). While an "investment contract" is not defined by the Securities Act, the Supreme Court's seminal decision in *SEC v. W.J. Howey Co.* established that an investment contract is a "transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." 328 U.S. 293, 299 (1946). Thus, the Apex lease agreements were securities if they were: (1) "an investment of money," (2) "in a common enterprise," (3) "with profits to come solely from the efforts of others." *SEC v. Infinity Group Co.*, 212 F.3d 180, 187 (3d Cir. 2000).

Here, Defendants appear to concede that the Apex lease agreements satisfy the first and third prongs of the *Howey* test. Rather, Defendants argue that the Apex lease agreements do not satisfy the second prong, i.e., the "common enterprise" requirement. (Lotito Br. at 14, Hagan Br. at 10.) The Third Circuit has "held that the common enterprise requirement is satisfied by 'horizontal commonality,'" which is the "pooling of investors' contributions and distribution of profits and losses on a pro-rata basis among investors." *Infinity Group Co.*, 212 F.3d at 187–88. Defendants deny that horizontal commonality exists here because the Apex Program involved individual lease agreements and did not involve the pooling of resources or a collective enterprise. (Lotito Br. at 15, Hagan Br. at 11.)

7

However, Defendants' denial of horizontal commonality is contrary to the SAC. According to the well-pled allegations, investors would purchase Apex Packs from ApexTech and immediately lease them to SafeTek, who would then deploy the Apex Packs in data processing centers worldwide. (SAC ¶ 67.) SafeTek was in the business of "big technology data processing," which allowed it to use the Apex Packs to "satisfy their proprietary business model and generate revenue." (*Id.* ¶ 67–68.) Each investor would purchase the Apex Pack for approximately $15,000 in exchange for monthly lease payments ranging between $300 and $500. (*Id.* ¶ 63–64.) Importantly, the lease payments were for fixed amounts and therefore not contingent on the performance of the individual Apex Pack. (*Id.* ¶ 49.) Indeed, when SafeTek began experiencing operational delays, it reduced lease payments for all investors to $100. (*Id.* ¶ 76.) According to Hagan, this was done, because "[a]ll leases are pooled as per agreement so instead of paying some and not others, they are making partial payments for a few payment cycles and any funds that were not paid will be added on to the end of the lease and paid then." (*Id.* ¶ 77.) This is exactly the type of "pooling of investors' contributions and distribution of profits and losses on a pro-rata basis among investors" that satisfies the horizontal commonality requirement under Third Circuit precedent. *Infinity Group Co.*, 212 F.3d at 187–88.

Defendants' reliance on *SEC v. Binance Holdings* to the contrary is misplaced. (Lotito Br. at 15, Hagan Br. 11.) In that case, a district court dismissed claims related to Binance's "Simple Earn" program, finding that there was no pooling of investments or reliance on Binance's managerial efforts. *See SEC v. Binance Holdings Ltd.*, 738 F. Supp. 3d 20, 26 (D.D.C. 2024). There, the holders of cryptocurrency assets agreed to loan them to Binance for a specified period of time at a specified rate of interest. *Id.* There were no allegations that Binance's efforts would generate the return or make the assets more valuable, and "Binance could pool the assets or not,

8

and it could deploy them for any purpose, without any connection between the use of the funds and the rewards paid to investors." *Id.* (citation modified). Moreover, there were no allegations "that people who participated in the program reasonably understood that the tokens they loaned would be put towards the enhancement of the vaunted Binance 'ecosystem' or any other enterprise, or that the interest rate was dependent on that enterprise's success." *Id.*

Here, in contrast, the SAC adequately alleges that the Apex Packs were going to be put towards SafeTek's data processing operations and overall business model. (SAC ¶ 68.) Moreover, as Hagan himself stated, the lease payments were tied to the overall revenue generated from the Apex Packs and thus were not connected to the individual performance of any one Apex Pack. (*Id.* ¶ 77.) The Apex Program is also fundamentally different than the Simple Earn program because the investors here were purchasing the Apex Pack solely to participate in the leaseback program, as opposed to the investors in *Binance* who had previously owned their cryptocurrency assets and simply leased them to Binance.[4] Accordingly, the Court finds that the "common enterprise" element is satisfied and that the Apex lease agreements constitute securities under the federal securities laws.

### C. Fraud Claims

In its first and second causes of action, the SEC alleges violations of Section 10(b) of the Exchange Act and Section 17(a) of the Securities Act and Rule 10b-5 thereunder. "These statutes and rule all proscribe fraudulent conduct in connection with the purchase and/or sale of securities, and the elements required to prove violations are essentially the same." *SEC v. Desai*, 145 F. Supp.

---

[4] Defendants also rely on *Dettmering v. VBit Techs. Corp.*, Civ. No. 22-1482, 2024 WL 3617604 (D. Del. Aug. 1, 2024), *report and recommendation adopted*, 2024 WL 4723250 (D. Del. Nov. 8, 2024.) But there, our sister court found that "Plaintiffs' profits were derived from their *individual use* of their own hardware" and the pooling of hardware "had no bearing on the distribution of profits and losses." *Id.* at *4 (emphasis added). By contrast, the Apex Program investors had no control over their Apex Packs and, as noted previously, the profits and losses were distributed to investors on a pro rata basis, regardless of each Apex Packs' individual performance.

3d 329, 335 (D.N.J. 2015). To plead a claim, the SEC must allege: (1) a material misrepresentation or omission or a fraudulent scheme, (2) made with scienter, and (3) in connection with the purchase or sale of a security. *See SEC v. Lucent Techs., Inc.*, 610 F. Supp. 2d 342, 349 (D.N.J. 2009). Where, as here, the allegations "sound in fraud," the SEC must state "the circumstances constituting fraud or mistake with particularity." *SEC v. Thompson*, 238 F. Supp. 3d 575, 591 (S.D.N.Y. 2017).

1. Material Misrepresentations and Omissions

According to the SEC, between April 27, 2020 and June 30, 2020, Hagan made material misrepresentations concerning the amount of the lease payments investors would receive by failing to disclose that Investview was having difficulty acquiring Apex Packs and had reduced lease payments to existing investors, which Defendants learned about through the April 27th Investview email. (SAC ¶¶ 157, 159–60.) In support of this allegation, the SEC points to a service agreement dated June 30, 2020, where ScryptMob agreed to purchase Apex Packs from ApexTech and promised monthly payments of $500 for 60 months. (*Id.* ¶ 161.) Defendants argue this service agreement was not false or misleading at the time it was executed because at the time the agreement was signed, Defendants understood that the full lease payments would be made. (Hagan Br. at 14.) Specifically, Defendants claim that investors were not due to receive payments until 90 days after the execution of the relevant lease, which meant that they were not owed payments until late July 2020. (*Id.*) And given that Investview's April 27th email stated that the temporary lease payment reduction would only last through June 2020 and that lease payments would be made up on the back end, the service agreements' promise of $500 was not false or misleading. (*Id.*)

Contrary to Defendants' arguments, the SEC has plausibly alleged that the service agreements at issue were materially false and misleading at the time they were entered into. "To prevail on a § 10(b) claim, a plaintiff must show that the defendant made a misleading statement

10

or omission as to a material fact." *Henry v. Futu Holdings Ltd.*, Civ. No. 23-3222, 2024 WL 4285129, at *14 (D.N.J. Sept. 25, 2024) (citation modified). The "test for materiality is whether 'there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *SEC v. Chiase*, Civ. No. 10-5110, 2011 WL 6176209, at *4 (D.N.J. Dec. 12, 2011). However, Section 10(b) does "not create an affirmative duty to disclose any and all material information." *Henry*, 2024 WL 4285129, at *14. Rather, disclosure is required only when necessary to make the statements made not misleading. *Id.*

Here, the SAC alleges that Defendants' failure to disclose the reduction in payments and supply chain issues to investors after April 27, 2020 was materially misleading. According to the well-pled allegations, by April 27, 2020, Defendants knew that Investview was having "significant manufacturing delays" and that SafeTek had to reduce operational capacity by 80%. (SAC ¶ 75.) As alleged, this was not a minor shipping delay or one-off mishap in the Apex Program, but rather a substantial threat to the entire business model. Indeed, Lotito allegedly referred to the reduction in lease payments as "a fatal flaw" and "a disaster," and warned that if investors knew they would "not invest in this program going forward." (SAC ¶ 80.) Any reasonable investor would want to know about the significant challenges facing the company, and Defendants apparent failure to disclose them was materially misleading.

Defendants also argue that the SAC's claims based on service agreements entered post-June 2020 were not materially false or misleading. (Hagan Br. at 15.) As alleged, by June 30, 2020, Investview stopped accepting new investments into the Apex Program. (SAC ¶ 163.) However, Hagan allegedly continued to sell the lease agreements to prospective investors anyway, promising them that ScryptMob would purchase "Data Technology Units" from ApexTech and

11

that the Apex Units would be used for "data processing, data mining, and cryptocurrency mining." (*Id.* ¶¶ 164–167.) The SAC further alleges that Hagan sold two investments in the Apex Program after June 30, 2020, and that he kept the money for himself instead of using it to purchase the Apex Packs. (*Id.* ¶¶ 169–70.) Defendants argue that the service agreements did not state that the customer funds would be remitted to ApexTech or "contain any representation about where the funds would be sent." (Opp. at 16.)

Whether the service agreements specifically state that Hagan would send the money to ApexTech or not is of no consequence. As alleged, Hagan was to take the funds from the investors to purchase the Apex Packs, something the SEC alleges he plainly did not do. (SAC ¶¶ 166, 170.) Accepting the SAC's allegations as true, Hagan's continued sale of Apex Program investments, despite Investview no longer accepting them, is unquestionably a material misrepresentation and omission. *See SEC v. Vuuzle Media Corp.*, Civ. No. 21-1226, 2023 WL 4118438, at *5 (D.N.J. June. 22, 2023) ("There is no question a reasonable investor would consider important the fact that the 'security' at issue did not exist . . . and that the money paid for those securities would be misappropriated.").

The SAC also alleges that one of the two post-June 2020 lease agreements claimed to be protected by an insurance program, but that Hagan knew that was not true because the program no longer existed. (SAC ¶¶ 171–72.) Defendants argue this agreement is not materially false or misleading because it is "squarely contradicted by the service agreements themselves." (Hagan Br. at 16.) However, the agreement Defendants' claim to contradict the SAC explicitly states that "insurance on the two units [sic] paperwork to follow." (Hagan Ex. D-1.) This supports the SAC's allegations that Hagan misrepresented to an investor that the Apex Packs were protected by an insurance program. (SAC ¶ 171.) Accepting as true that the Apex Program had been discontinued

and Hagan did not purchase the investment he said he would, the SEC has plausibly alleged that his statements concerning the Apex insurance program were materially false and misleading.

    2.  <u>Scienter</u>

  Defendants next argue that the claims should be dismissed because the SEC has not plausibly alleged that Hagan or ScryptMob acted with the requisite scienter. (Hagan Br. at 17.) "Scienter is a mental state embracing intent to deceive, manipulate or defraud," and in securities fraud actions, "includes recklessness." *Infinity Group Co.*, 212 F.3d at 192. Recklessness is established by alleging "highly unreasonable (conduct), involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Id.* (citation modified). To adequately plead scienter, the SEC must either: "(1) identify circumstances indicating conscious or reckless behavior by defendants or (2) allege facts showing both motive and a clear opportunity for committing the fraud." While "good faith, without more, does not necessarily preclude a finding of recklessness," a defendant "may still be liable for securities fraud if their belief was based upon nothing more than a reckless disregard of the truth." *Id.*

  Here, the SEC adequately alleges Hagan and ScryptMob acted with the requisite scienter. Regarding the post-April 2020 misstatement, the SEC argues and alleges that Hagan knew that existing investors were only set to receive $100 per month while still representing to prospective investors that they would be paid between $300 and $500 per month. (Opp. at 29; SAC ¶¶ 157, 160.) However, Hagan argues that he credited Investview's April 27, 2020 email informing him that payments would resume within 30 to 60 days, and therefore he did not have the requisite scienter. (Hagan Br. at 18.) According to the allegations in the SAC, Investview informed Hagan that payments would resume within 30 to 60 days and that it would make up any shortfalls at the

13

end of the lease term. (SAC ¶ 76.) If that were all the SEC alleged, that would be the end of the analysis, and the Court may have held it to be insufficient to establish scienter. However, the SEC also alleges that Hagan misappropriated money he received from investors in December 2019, using some of the funds to pay taxes to the IRS and for personal retail expenses. (*Id.* ¶ 181.) Hagan's alleged misappropriation of customer funds in December 2019, followed by his material misrepresentations between April 27, 2020 and June 30, 2020, support the allegation that Hagan had the requisite scienter to sustain a securities fraud claim.

Defendants further contend that the post-June 30, 2020 services agreements must be dismissed because the SAC fails to adequately plead scienter. (Hagan Br. at 18.) This argument is unfounded. The SAC sets forth multiple well-pled allegations demonstrating that Hagan acted with scienter with respect to the post-June 2020 services agreement. As alleged in the SAC, on June 30, 2020, Investview halted new Apex Program sales, and by July 1, 2020, any attempt to purchase Apex Packs by the electronic system used by ApexTech would result in an error message. (SAC ¶¶ 85–86.) Despite Investview's discontinuation of Apex Program sales, Hagan allegedly continued to sell investments in the Apex Program. (*Id.* ¶ 165.) Moreover, the SAC alleges that Hagan took the investors' money and kept it for himself. (*Id.* ¶ 170.) Like with Hagan's misrepresentations between April 27, 2020 and June 30, 2020, the SEC has sufficiently alleged scienter for Hagan's post-June 30, 2020 statements.

### D. Scheme Liability

Finally, Defendants argue that the "SEC's scheme liability theory fails because the Complaint does not plausibly allege any deceptive or manipulative act by Mr. Hagan or ScryptMob, let alone one taken in furtherance of a fraudulent scheme." (Hagan Br. at 19.) To state a claim of scheme liability, plaintiffs "must allege (1) that the defendant committed a

deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance." *Lucent Techs., Inc.*, 610 F. Supp. 2d at 351.  The Supreme Court has held that "[t]hese provisions capture a wide range of conduct" and that there is "considerable overlap among the subsections of the Rule," including the section prohibiting misstatements.  *Lorenzo v. SEC*, 587 U.S. 71, 79–80 (2019).  However, "misstatements and omissions alone are not enough for scheme liability." *SEC v. Rio Tinto plc*, 41 F.4th 47, 54 (2d Cir. 2022).  There must be "something extra" for plaintiffs to bring a claim under Rules 10b-5(a) and (c). *In re Turquoise Hill Resources Ltd. Sec. Litig.*, 625 F. Supp. 3d 164, 251 (S.D.N.Y. 2022).

      Here, Defendants argue that the SAC's allegations regarding Hagan's purported misappropriation are "conclusory" and "not supported by the facts alleged." (Hagan Br. at 19.) However, the SAC's allegations are plainly sufficient to support Hagan's deceptive conduct. Indeed, the SAC alleges that Hagan diverted investor money to his own personal bank account for personal expenses. (SAC ¶¶ 175–89.)  This was done both before and after Investview discontinued new sales to the Apex Program. (*Id.*)  The SAC thus sufficiently alleges that Hagan's conduct was "deceptive" to support a claim for scheme liability.  *See Infinity,* 212 F.3d at 193–94 (schemes where investor funds are utilized for personal benefit or to pay other investors are a form of a scheme to defraud).

      While Defendants argue that there are no allegations that Hagan intended to retain the funds, that argument is without merit.  As alleged, Hagan entered into service agreements with investors whereby ScryptMob would purchase Apex Packs on behalf of investors.  (SAC ¶ 166.) For example, on August 11, 2020 an investor wired $25,000 into a ScryptMob account for the purchase of two Apex Packs. (*Id.* ¶ 183.)  Instead of purchasing the Apex Packs, Hagan transferred $15,000 to his personal checking account and spent these funds at a supermarket, phone provider,

15

and on gas and electric bills.  (*Id.* ¶¶ 183–86.)  Hagan sent none of these funds to ApexTech to purchase the Apex Packs (nor could he, given the discontinuation of the program).  (*Id.* ¶ 187.)  Accordingly, the SAC provides detailed allegations of Hagan's deceptive conduct and are sufficient to sustain a claim of scheme liability.

V. **CONCLUSION**

For the reasons stated above, the Court will **DENY** Defendants' motions to dismiss.  An appropriate Order will follow.


Date: November 24, 2025

s/ Zahid N. Quraishi
**ZAHID N. QURAISHI**
**UNITED STATES DISTRICT JUDGE**
